IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HAIWEN CHEN, | : |
| | : |
| Plaintiff, | : |
| | : C.A. No. _____ |
| v. | : |
| | : JURY TRIAL DEMANDED |
| EDUCATIONAL TESTING | : |
| SERVICE, INC, | : |
| A DELAWARE CORPORATION | : |
| | : |
| Defendant. | : |

**COMPLAINT**

**THE PARTIES**

1. Plaintiff, Haiwen Chen ("Mr. Chen" or "Plaintiff"), is an adult individual, over the age of forty (DOB 2/2/55, age 67), who resides at 915 Mather Dr., Bear, DE 19701. Mr. Chen was, at all times relevant, an employee of Education Testing Service ("ETS").

2. Defendant, Education Testing Service ("ETS") is a non-profit corporation, incorporated in the State of Delaware, on October 26, 1990, Delaware corporate number 2244882. ETS is licensed by the State of Delaware, Department of Finance, Division of Revenue, account number 2019700153. ETS is also a primary federal contractor for the United States Department of Education (National Assessment of Education Progress ("NAEP')), and other federal agencies. ETS' business address is 660 Rosedale Road, Princeton, N.J. 08540-2218. ETS' registered agent for service of process is Corporation Service Company, 252 Little Falls Drive, Wilmington, DE 19808. At all times relevant hereto, Defendant was acting through its agents, servants, and employees, who were authorized and acting within the scope of their authority, course of employment, and under the direct control of Defendant.

**JURISDICTION AND VENUE**

1

3. This action arises under the Age Discrimination in Employment Act ("ADEA"), Title 28 U.S.C. §633a(a) and is brought by Plaintiff against the Defendant who is a U.S. government contractor, and/or in the alternative pursuant to 28 U.S.C. §621, to redress arbitrary, improper, unlawful, willful, deliberate, and intentional discrimination and/or retaliation by the Defendant, concerning Plaintiff's compensation, terms, conditions, and privileges of employment, and based on his opposition to discrimination in the workplace.

4. The jurisdiction of this Court is invoked pursuant to Title 28 U.S.C. §1331, and the ADEA, which provide for original jurisdiction of Plaintiff's claim arising under the laws of the United States.

5. The venue of this Court is invoked pursuant to the dictates of Title 28 U.S.C. §1391.

6. All conditions precedent to the institution of this suit have been fulfilled. A Notice of Right to Sue was issued by the U.S. Equal Employment Opportunity Commission ("EEOC") Charge number 17C-2019-00280, on February 3, 2022, was received by Plaintiff on February 3, 2022, and this action has been originally commenced by the Plaintiff within ninety (90) days of receipt of said notice. Plaintiff has exhausted all other jurisdictional requirements for the maintenance of this action. A copy of the Notice of Right to Sue is attached hereto as Exhibit "A" and is incorporated herein by reference.

**BACKGROUND**

7. Mr. Chen (DOB 02/02/55 age 67) at the time relevant to this complaint, was 63 years old and a member of the protected class under the ADEA. He was then a senior psychometrician employed by Educational Testing Service (ETS") from January 22, 2002, until November 5, 2018. ETS is, here and at relevant all times, a federal government contractor and

subject to all of the provisions of the Age Discrimination in Employment Act ("ADEA"), Title 28 U.S.C. §633a(a).

8. In 2008, Mr. Chen moved to the Center of Global Assessment, in the group of Psychometrics & Data Analysis, at a salary of $140,000 per year. He worked on an international assessment team of 5-6 members. He was also the senior member of the team, by about twenty (20) years, with the highest salary, and close to retirement when he would be receiving his deferred compensation in the form of health benefits.

9. In 2010, Mr. Chen, by then working as a telecommuter, which was sanctioned and approved by ETS, relocated to Bear, Delaware; 90 miles from ETS' home office in Princeton, New Jersey. As a telecommuter, Mr. Chen was required to sign an Alternate Worksite Agreement (AWA) in 2011 and 2016. The 2016 AWA placed Mr. Chen's office location at his home in Bear, Delaware, at 100% of his working time, with no permanent workspace in Princeton. ETS also acknowledged that Mr. Chen's workplace was at his residence by paying his income taxes and unemployment insurance tax to Delaware. He never paid any taxes to New Jersey and when he was discharged, he collected Delaware unemployment benefits.

10. Throughout his sixteen years with ETS, he proved to be a good, loyal and valuable employee, with exemplary reviews and personal evaluations over the years.

11. In August of 2018, Lale Khorramdel ("Ms. Khorramdel"), Mr. Chen's team manager, announced she was leaving, and Fred Robin ("Mr. Robin"), who was a member of Mr. Chen's "team" would be promoted to her position. Mr. Robin came to Mr. Chen's group in 2017, as a Senior Psychometrician. Mr. Chen who was sixty-two at that time, and had 10 years seniority over Mr. Robin, was passed over for promotion.

12. Mr. Chen knew Mr. Robin for over 10 years before he was promoted to team manager and they worked together on various projects for about one year. Mr. Chen was Mr. Robin's unofficial mentor when he came to work on the team in 2017.

13. In early September, under a pretext, Mr. Robin and Ms. Khorramdel decided to dramatically change the conditions of Mr. Chen's employment and require him to come to ETS's office in Princeton N.J., every Monday, Tuesday, and Wednesday for an indefinite period. Such a change would require Mr. Chen to travel from Bear, Delaware, over ninety (90) miles away, to Princeton three consecutive days a week. That is a round trip of one hundred and eighty (180) miles requiring a travel day of approximately 6-8 hours depending on traffic. No one else on the team, including two other telecommuters, were required to change their conditions of employment so dramatically.

14. The change in Mr. Chen's working conditions was a pretext. It had no rationale or legitimate basis. Mr. Robin and Ms. Khorramdel falsely asserted the modification to Mr. Chen's work conditions were to allow Mr. Robin to "get to know" Mr. Chen and determine how he can contribute to the team; Even though Mr. Chen knew and had worked with Mr. Robin for the previous ten years, including at least a year on the same team.

15. In order to comply with the change in his work conditions and satisfy ETS' demands Mr. Chen contacted Dan McCaffery ("Mr. McCaffery"), the division director, and Ebony Jones ("Ms. Jones") Human Resources liaison for his division. He stated how difficult driving three days a week to ETS from Bear, Delaware, would be for him at his age as well as extremely exhausting and dangerous. He presented good-faith suggestions for resolving the matter. His suggestions were met with deaf ears. Mr. McCaffrey stated, "it is critical that you be on-site more frequently to provide Fred (Mr. Robin) an opportunity to get to know you and

determine how you can contribute to the team." That was quite a revelation since Mr. Chen knew Mr. Robin for an excess of ten years and worked with him on several projects. He also served as Mr. Robin's unofficial mentor when Mr. Robin joined the team in 2017.

16. In October 2018, Mr. Chen's team hired another telecommuter, making this two members of Mr. Chen's team who were in similar situations (comparators). However, the same requirement enforced on Mr. Chen was not imposed on them. Both were telecommuters, younger, with lower salaries, less seniority, and not close to retirement. They also had less contact and work history with Mr. Robin than did Mr. Chen.

17. The team members in a similar situation as Mr. Chen are Hyo Jeong Shin ("Hyo Jeong") and Peter van Rijn ("Mr. van Rijin."). Hyo Jeong was then in her thirties and lived in Long Island, New York; approximately the same distance from ETS as Mr. Chen. She was not required to change her normal schedule or any conditions of employment due to the transition of leadership to Mr. Robin.

18. The other telecommuter was Mr. van Rijin, then in his forties, and new to the team. He was brought into the team several weeks before Mr. Chen was discharged. The plaintiff contends that Mr. van Rijin was brought in to take Mr. Chen's place. Mr. van Rijin had never worked with Mr. Robin before a meeting on October 9, 2018. Additionally, he resided in the Netherlands, and was a telecommuting employee.

19. On October 9, Mr. Chen came to ETS for the PISA/PIAAC weekly and group meeting. At the meeting, to Mr. Chen's surprise, Mr. van Rijn was introduced. Upon information and belief Mr. van Rijn worked at the Princeton campus for less than four (4) days and returned to the Netherlands. He had no previous experience working with Mr. Robin. Mr.

van Rijn was not required to work directly under Mr. Robin at ETS' facility in New Jersey for any amount of time as was imposed upon Mr. Chen.

20. Mr. Chen thereafter filed a complaint under ETS' Employment Policies and Standards for violation of the ADEA and Constructive Discharge with ETS' Human Resources Department. The Employment Policies and Standards mandates that "Any inquiries or complaints will be treated as confidential as is consistent with a prompt and thorough investigation of the complaint."

21. Mr. Chen's complaint was ignored, in direct violation of ETS' Employment Policies and Standards, for about twenty-six (26) days, until shortly before he was discharged on November 5, 2018. No investigation was promptly commenced, directly contrary to the ETS' employment manual and its Employment Policies and Standards against Age Discrimination,

22. Mr. Chen also delivered a copy of the letter to the present manager Ms. Khorramdel, who became agitated and refused to provide Mr. Chen with a signed copy.

23. Almost immediately after ETS received Mr. Chen's complaint, both Ms. Khorramdel and Mr. Robin retaliated against Mr. Chen; contrary to ETS' Employment Policies and Standards of Non-Retaliation. They unjustly and without cause criticized his work product and denied his application for vacation. This was the first time in sixteen years working at ETS that he was ever denied vacation time.

24. On October 2, Ms. Jones from Human Resources acknowledged his complaint, not by starting an investigation but by asking a question, "Can you please clarify for me: if you were able to drive to the office that Monday that seems to be inconsistent with your statement of exhaustion. Can you advise?" Her statement seems to display a predetermination that Mr. Chen's complaint was groundless, without an investigation.

25. It soon became quite clear that management (Mr. Robin and Ms. Khorramdel) wanted a younger individual on the team and conspired with the assistance of higher ETS officials to place Mr. Chen in such an unsustainable position that he would be forced to resign or get fired. They were planning a constructive discharge for Mr. Chen.

26. On October 3, Mr. Chen's counsel informed Ebony Jones, by letter and email that Mr. Chen was experiencing retaliation from his managers. There was no action taken by Human Resources, directly contrary to ETS' employment manual and ETS' Employment Policies, Standards, and Procedures for a Retaliation complaint. The latter require that "Any inquiries or complaints will be treated as confidential as is consistent with a prompt and thorough investigation of the complaint."

27. The retaliation by and through employees of ETS continued and increased, and Mr. Chen's performance was unjustly criticized and his ability to do his work was impeded by ETS' management and executives. These actions compromised his health, resulting in high anxiety, depression, and sleepless nights.

28. ETS' management began to purposely interfere with his work. On October 14-15, 2018, Mr. Chen began to experience something unusual that drastically affected his ability to do his job. He was not getting any data from the Data Analysis team (DA). DA is the team that provides the essential data for Mr. Chen and other members of his team to perform their job functions. This elimination of the receipt of data from DA made it impossible for Mr. Chen to perform his normal job functions. No explanation was provided.

29. On October 18, 2018, Mr. Robin forwarded an email to Mr. Chen accusing him of unprofessional conduct and insubordination. He claimed that Mr. Chen's behavior was

insubordination under ETS' Progressive Disciplinary policy; A policy that was purposefully ignored by ETS concerning Mr. Chen's complaints.

30. As a response to Mr. Robin's October 18 email, Mr. Chen again contacted Ebony at HR for assistance. Mr. Chen stated, "I just received an email from Frederic Robin (of which you were copied on), threatening me with a charge of insubordination if I don't come into the office Monday, Tuesday, and Wednesday every workweek. I don't believe I am insubordinate. Considering my previous evaluations, I have been a valuable and faithful employee of ETS. I am 63 years old and only a few years from retiring, traveling eighteen hours in three days would be extremely strenuous and dangerous. I do not believe other telecommuters are subject to the same burden. I firmly believe the conduct taken by Mr. Robin and Ms. Khorramdel is disingenuous and retaliatory. Since I requested an investigation for what I believed to be discriminatory conduct, their actions have gotten more hostile towards me. I request that you intervene on my behalf."

31. ETS has a personnel handbook and policies and procedures. The conduct exhibited by its management staff patently violated ETS' policies and procedures regarding Mr. Chen's complaints of Age Discrimination and Retaliation. "An employee who has questions about this policy or believes they have been discriminated against based on age should notify their Human Recourses Business Partner. Any inquiries or complaints will be treated as confidential as is consistent with a prompt and thorough investigation of the complaint."

32 This was the third time Mr. Chen contacted HR for assistance.

33. The Plaintiff believes that ETS, in bad faith and with full knowledge and intent for Mr. Chen to be constructively discharged, completely disregarded its personnel policies on Age Discrimination, Retaliation, and Progressive Discipline.

34. Ms. Jones replied to Mr. Chen on October 19 by email, stating that ETS is amid fact-finding in the investigation and that Mr. Chen should expect to hear from Eric Waxman ("Mr. Waxman"), who will arrange a meeting next week at the Rosedale campus. The fact that Ms. Jones stated ETS was in "the midst of an investigation" he later learned was untruthful. Mr. Chen asked at his October 24 interview with Mr. Waxman: "when did the investigation start?" Mr. Waxman's reply: "today."

35. On Wednesday, October 24, Mr. Chen, with his attorney, met with Mr. Waxman. The interview lasted about forty (40) minutes. As a condition for his appearance with his client Mr. Chin's attorney was not permitted to speak until after the conclusion of the interview.[1]

36. The interview, about four weeks in the making, was perfunctory. Mr. Waxman told him nothing about the investigation except *it started today*. There was no explanation about the process, what will happen after he was interviewed, how he will be contacted with the results, and what could happen to him as far as the progressive discipline policy or any other ETS policy. At the end of the meeting Mr. Waxman was again asked when did the investigation start, he replied, "today."

37. On October 26, Mr. Chen received a phone call from Daniel Papa, Executive Director, HR Service Delivery. Mr. Chen was informed Mr. Waxman had completed the investigation and has found no evidence to support his (Mr. Chen's) claims. Mr. Chen requested written notification, and at 2:34 pm he received an email with the same message. He received no other explanation or detail as to why Mr. Waxman came to his conclusion.

---

[1] Mr. Chen is a naturalized American citizen, and English is his second language. Mr. Chen did have difficulty explaining some of the adverse actions taken by Mr. Robin, Ms. Khorramdel and other ETS' officials. Mr. Chen's attorney was not permitted to assist him.

38. ETS never provided Mr. Chen with an investigative report.  Mr. Chen's attorney found the report in Defendant's EEOC position statement to Mr. Chen's charge.   The report had no dates, no mention of when the investigation was started or closed, or when Ms. Khorramdel and Mr. Robin were interviewed.  It also omitted any reference to the two attorney letters alleging Age Discrimination and retaliation, and there was no signature by the investigator.

39. At that time, Mr. Chen was sixty-three, not an age conducive to getting another position.  So he decided to return to the ETS campus on Monday, October 29, to maintain his position as long as he could.  When he got to ETS, he emailed Mr. Robin, "I am on campus today, so if you want to discuss the work, I can come to your office."  He received no reply.  That evening it took Mr. Chen about four hours to get home due to the traffic.  He returned home depressed and exhausted.  Worrying about his welfare, his wife strongly expressed to him not to go into ETS and email Mr. Robin.

40. Wednesday, October 31, 2018, Mr. Robin sent to Mr. Chen a final warning, by email, stating that "he was to report to work 3 days a week at the ETS Rosedale Office. From 9:00 am to 5:30 pm."

41. On Monday morning, November 5, Henry sent an email to Mr. Robin from his worksite in Bear, Delaware requesting work.  "As you know, I have not received any work assignments for three weeks."  On the same day at 4:45 pm, Mr. Robin discharged Mr. Chen from his position at ETS for the disingenuous reason of abandonment of his position.  This was the first and only time he was ever informed of this particular accusation.

## COUNT I
## VIOLATION OF AGE DISCRIMINATION IN EMPLOYMENT ACT ("ADEA")

42. Plaintiff incorporates by reference paragraphs 1 through 41 of this Complaint as fully set forth at length herein.

43. Plaintiff is presently 67 years of age and was, at all times relevant to these proceedings, over age 40. Plaintiff is therefore a member of the class of persons protected by the Age Discrimination in Employment Act ("ADEA").

44. ETS, by and through its employees, violated the ADEA by promoting employees other than Plaintiff who had less experience, qualifications, and seniority. Mr. Chen was targeted for elimination by ETS due to his advanced age, and proximity to retirement.

45. ETS by and through its employees, including but not limited to Mr. Robin and Ms. Khorramdel, violated ADEA by creating a hostile workplace with the intent to have Mr. Chen resign or be discharged. Such actions constituted an illegal constructive discharge and were motivated solely by Mr. Chen's advanced age.

46. ETS by and through its employees, including but not limited to, Mr. Robin and Ms. Khorramdel, decided as a pretext to dramatically change the conditions of Mr. Chen's employment and require him to come to ETS's office in Princeton N.J., every Monday, Tuesday, and Wednesday for an indefinite period. This unilateral and unjustified change to his working conditions would require him, at the age of 63, to travel from Bear, DE, to Princeton, N.J.; a daily round trip of approximately 180 miles. The intent of this change to his working conditions was to place Mr. Chen in such an unsustainable position that he would either be forced to resign or be discharged. Such actions constitute illegal constructive discharge, thereby violating the ADEA. Mr. Chen's comparators were not subjected to the same unjustified requirements.

47. As a result of the above actions taken by ETS through its employees, Mr. Chen was discharged from his position at ETS on November 5, 2018, in violation of the ADEA. Plaintiff has suffered, including but not limited to, economic detriment by loss of livelihood, medical insurance, reduced retirement savings, humiliation, embarrassment, mental anguish, and pain and suffering.

## COUNT II
## VIOLATIONS OF THE ADEA AND FEDERAL LAWS AND REGULATIONS

48. Plaintiff incorporates by reference paragraphs 1 through 47 of this Complaint as fully set forth at length herein.

49. ETS is, here and at relevant all times, a federal government contractor and subject to all the terms, provisions, and requirements regarding federal anti-discrimination laws, including but not limited, to age, race, color, religion, national origin, or sex.

50. These laws also protect employees against retaliation for going forward with a claim regarding discrimination in the workplace.

51. In compliance with State and Federal Law and/or the contractual terms of a federal contractor, ETS established a manual and Employment Policies and Standards for discrimination, including but not limited, to age, race, color, religion, national origin, or sex.

52. Inclusive in ETS' Employment Policies and Standards are procedures to be followed related to issues, including but not limited to, Age Discrimination, Sexual Harassment, Hostile Work Environment, and Retaliation.  ETS' policies and procedures state, "Any inquiries or complaints will be treated as confidential as is consistent with a prompt and thorough investigation of the complaint."

53. Mr. Chen filed a complaint about Age Discrimination and Constructive Discharge with ETS' Human Resources Department.  ETS purposely and in bad faith failed to follow its

Policies and Standards and mandated procedures by not providing a "prompt and thorough investigation of the complaint." These actions or lack thereof taken by ETS violated the Age Discrimination in Employment Act ("ADEA") and other federal laws for the protection against discrimination in the workplace.

54. On October 3, Mr. Chen's counsel informed Ms. Jones of the Human Resources Department, by letter and email, that Mr. Chen was experiencing retaliation from his managers, Mr. Robin, and Ms. Khorramdel, which was creating a hostile work environment. ETS purposely and in bad faith failed to follow its Policies and Standards and mandated procedures by not providing a "prompt and thorough investigation of the complaint." These actions or lack thereof taken by ETS violated the Age Discrimination in Employment Act ("ADEA") and other federal laws for the protection against discrimination and retaliation in the workplace.

55. As a result of ETS' actions the Plaintiff has suffered, including but not limited to, discharge from employment, economic detriment by discharge from employment, loss of livelihood, medical insurance, reduced retirement savings, humiliation, embarrassment, mental anguish, and pain and suffering.

## COUNT III - RETALIATION

56. Plaintiff incorporates by reference paragraphs 1 through 55 of this Complaint as fully set forth at length herein.

57. Mr. Chen made a complaint about retaliatory conduct on the part of his managers with ETS' Human Resources Department.

58. ETS did nothing in response to Mr. Chen's retaliation complaint, contrary to its employment manual and its Employment Policies and Standards against Retaliation. There was no prompt action taken on his complaint.

59. Almost immediately after ETS received Mr. Chen's initial complaint, both Ms. Khorramdel and Mr. Robin retaliated against Mr. Chen. They criticized and demeaned his work product, and denied his application for vacation. This was the first time in sixteen years working at ETS that he was ever denied vacation time.

60. On October 3, Mr. Chen's counsel informed Ms. Jones, by letter and email, that Mr. Chen was experiencing retaliation from his managers. Once more, there was no action taken by Human Resources, directly contrary to ETS' Employment Policies, and Standards, which state: "Retaliation against anyone who makes a complaint or cooperates in an investigation under this policy is prohibited. Retaliation is a very serious violation of this policy and should be reported immediately. The reporting and investigation of complaints of retaliation will follow the procedures outlined in this policy…"

61. The retaliation intensified and created a toxic and hostile workplace where Mr. Chen suffered additional adverse consequences, including but not limited to, unjust criticism, impeding his ability to do his work, a written disciplinary warning, denial of vacation time, and no actions taken on his complaints.

62. On November 5, 2018, Mr. Chen was illegally discharged for the disingenuous reason of abandonment of his position. This was the first and only time he was ever informed of this accusation. ETS, in bad faith, used the pretext of job abandonment for Mr. Chen's discharge to avoid ETS' policy and procedure of progressive discipline, and did so in a manner that was retaliatory.

63. As a result of ETS' illegal actions Plaintiff has suffered, including but not limited to, discharge from employment, economic detriment by loss of livelihood, medical insurance, reduced retirement savings, humiliation, embarrassment, mental anguish, and pain and suffering.

## COUNT IV
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

64. Plaintiff incorporates by reference paragraphs 1 through 63 of this Complaint as fully set forth at length herein.

65. ETS, through its management employees who had responsibility for supervising Mr. Chen, harbored ill will towards Mr. Chen.

66. ETS, through its management employees who had responsibility for supervising Mr. Chen, intended to cause harm to Mr. Chen and did so by way of the acts and omissions described more fully above: including but not limited to passing him over for promotion; imposing work requirements unique to Mr. Chen, which were designed to cause him to resign or suffer termination; removed from Mr. Chen access to information and data that would allow him to perform the functions of his job; ignoring his requests for said information and data; and terminating him for an previously unannounced or identified basis.

67. ETS, through its management employees who had responsibility for supervising Mr. Chen, acted to cause Mr. Chen's employment to be terminated and in fact their conduct did result in his termination.

68. As a result of ETS' illegal actions Plaintiff has suffered, including but not limited to, discharge from employment, economic detriment by loss of livelihood, medical insurance, reduced retirement savings, humiliation, embarrassment, mental anguish, and pain and suffering.

## COUNT V
## WRONGFUL DISCHARGE VIOLATION OF THE ADEA AND PUBLIC POLICY

69. Plaintiff incorporates by reference paragraphs 1 through 68 of this Complaint as fully set forth at length herein.

70. Mr. Chen was a senior psychometrician and a telecommuter employed by Educational Testing Service (ETS") from January 22, 2002, until November 5, 2018.

71. He was working under an implied employment contract. At all relevant times, Mr. Chen was 63 years old and in a protected class under the ADEA.

72. In August of 2018, Ms. Khorramdel, Mr. Chen's team manager, announced she was leaving, and Mr. Robin, who was a member of Mr. Chen's "team" would be promoted to her position.

73. In early September, under a pretext, Mr. Robin and Ms. Khorramdel decided to dramatically change the conditions of Mr. Chen's employment and require him to come to ETS's office in Princeton N.J., every Monday, Tuesday, and Wednesday for an indefinite period; A round trip of one hundred and eighty (180) miles requires a travel day of approximately 6-8 hours depending on the traffic.

74. ETS through its employees acted with an improper motive, placing Mr. Chen in such an unsustainable position, that he would either have to resign or get fired, constituting a constructive discharge.

75. The change in Mr. Chen's working conditions was a subterfuge to get him to resign or get fired. It had no rationale or legitimate basis. ETS used the pretext that the change to Mr. Chen's work conditions was to allow "Mr. Robin to get to know Mr. Chen and determine how he can contribute to the team." Even though Mr. Chen knew Mr. Robin for ten years, and had worked with him on several projects since he came to Mr. Chen's team in 2017.

76. The Plaintiff alleges the reason for the change in working conditions was that Mr. Robin wanted Mr. Chen to be replaced with a younger person on his team contrary to the prohibitions of the ADEA and Public Policy

16

77. On November 5, 2018, Mr. Chen was illegally constructively discharged for the disingenuous reason of abandonment of his position. Mr. Chen was discharged in direct violation of the ADEA and Public Policy.

78. As a result, of ETS' illegal actions Plaintiff has suffered, including but not limited to, discharge from employment, economic detriment by loss of livelihood, medical insurance, reduced retirement savings, humiliation, embarrassment, mental anguish, and pain.

## COUNT VI
## WRONGFUL DISCHARGE VIOLATION OF THE ADEA AND PUBLIC POLICY

79. Plaintiff incorporates by reference paragraphs 1 through 78 of this Complaint as fully set forth at length herein.

80. On September 28, 2018, Mr. Chen filed a complaint under ETS' Employment Policies and Standards for violation of the ADEA, with ETS' Human Resources Department. No prompt action was taken as required by ETS' Employment Policies and Standards.

81. As a result of Mr. Chen's filed complaint, he became to experience retaliation, in the form of unjust criticism, interference with his ability to do his work, and a hostile work environment from ETS management including but not limited to Mr. Robin and Ms. Khorramdel.

82. On October 3, Mr. Chen's counsel informed Ms. Jones of the Human Resources Department, by letter and email that Mr. Chen was experiencing retaliation from his managers. Again, no prompt action was taken as required by ETS' Employment Policies and Standards.

83. On Wednesday, October 24, about four weeks in the making, Mr. Chen was given a perfunctory interview. The interview was conducted by Mr. Waxman of Human Resources. Mr. Chen, in the presence of his attorney, asked Mr. Waxman when did the investigation start, he replied, "today."

84. On November 5, 2015, Mr. Chen was discharged fully or partly because he filed complaints of Age Discrimination and Retaliation.

85. Filing complaints against age discrimination and retaliation are statutory rights and are supported by public policy. Wrongfully discharging Mr. Chen from his position with ETS, because he filed complaints of age discrimination and retaliation is illegal and a violation of public policy.

86. As a result, of ETS' illegal actions and violation of Public Policy, Plaintiff has suffered, including but not limited to, discharge from employment, economic detriment by loss of livelihood, medical insurance, reduced retirement savings, humiliation, embarrassment, mental anguish, and pain.

WHEREFORE, the plaintiff, Haiwen Chen, demands judgment against the defendant ETS for:

    a) Compensatory damages:

    b) Punitive damages:

    c) Back pay:

    d) Front pay:

    e) Compensatory and punitive damages caused by emotional distress, including but not limited to all medical costs and expenses.

    f) Damages caused by the ETS' breach of contract and violations of public interest and/or policy.

    g) All costs and expenses of this action, including but not limited to court costs, reasonable attorney's fees, expert fees, and other costs and expenses as appropriate; and

h)	Such further relief as the Court deems is just and equitable.


|  |  |
|---|---|
|  | Law Office of Martin C. Meltzer |
| April 29, 2022, | */s/ Martin C. Meltzer* |
|  | Martin C. Meltzer, Esquire (Bar I.D # 3053) |
|  | 4007 Coleridge Road |
|  | Wilmington, DE 19802 |
|  | (302) 502-2731 |
|  | Attorney for Plaintiff |